IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-733

Filed: 7 July 2020

Buncombe County, No. 17 CVD 4584

SHELLEY GOULAS STOWE, Plaintiff,

v.

RAYMOND LEE STOWE, Defendant.

Appeal by defendant from judgment and order entered 29 January 2019 by Judge Andrea F. Dray in Buncombe County District Court. Heard in the Court of Appeals 15 April 2020.

*Emily Sutton Dezio for plaintiff-appellee.*

*Fox Rothschild LLP, by Michelle D. Connell, for defendant-appellant.*

TYSON, Judge.

Raymond Lee Stowe ("Defendant") appeals from an equitable distribution judgment and order entered 29 January 2019. We affirm in part, reverse in part, and remand.

I. Background

Shelley Goulas Stowe ("Plaintiff") and Defendant were married on 5 October 1996 and separated on 11 September 2017. Two minor children were born of the marriage. The trial court entered a consent order for child custody and child support

on 22 June 2018. The consent order for child custody and child support is not a part of this appeal.

Defendant owned an Allstate Corporation captive insurance agency, which sold only Allstate insurance products. Both Plaintiff and Defendant felt that owning an independent insurance agency, rather than a captive agency, would better fit the family's needs. They purchased Madison Insurance Group, Inc. ("Madison"), an independent insurance agency, during the marriage. Madison is a North Carolina sub-S corporation. Madison sells policies issued by approximately thirty different vendors, but Allstate is the primary vendor, accounting for nearly one-third of the policies written.

The parties' equitable distribution trial, centered primarily on the value of Madison, began on 29 November 2018. Plaintiff engaged F. Foster Shriner as an expert witness to express an opinion of value of Madison. Plaintiff presented two letters to Plaintiff's attorney from Shriner, one dated 25 July 2018 and one dated 28 November 2018. Shriner's 25 July 2018 letter valued Madison at $531,435, while his later 28 November 2018 letter valued Madison at $511,212.

Both letters provided a "conclusion of value" of Madison, but stated that the records he relied upon were "incomplete, at best." The 25 July 2018 letter contained two additional documents: Madison's Form 1120S, a U.S. Corporation Income Tax Return for an S Corporation, from 2016 and a balance sheet dated 11 September 2017.

The 25 July 2018 letter contained the following asset values: $25,987 in cash, $26,100 for a note receivable, and $532,958 for goodwill/intangibles against liabilities of $53,610 for a note payable. The $532,958 for goodwill/intangibles estimate was calculated by multiplying the Madison 2016 revenues of $217,534 by a value of 2.45. The total estimated value of Madison was $531,435.

The 2.45 multiplier Shriner used to calculate estimated value was contained in an article sent by Plaintiff and Plaintiff's father to Shriner, entitled "First Quarter 2018 Allstate Agency Value Index." The article was found on PPC Loan's website, a lending company for Allstate Insurance agencies, and was written by its president and Chief Executive Officer, Paul Clarke. The article included a chart detailing "Allstate Agency Price to New/Renewal Commission Ratio (National Average)" for the fourth quarter of 2016, all of 2017, and the first quarter of 2018.

Shriner's 28 November 2018 letter reflected assets of: $24,790 in cash, $30,140 in a note receivable, and $532,958 in goodwill/intangibles against liabilities of $76,676 for a note payable. The total estimate of value was $511,212. The goodwill/intangibles were calculated using the same revenues and the 2.45 multiple as the 25 July 2018 letter. Nowhere in the letters or sheets is there a reference or certification the opinion was prepared according to Generally Accepted Accounting Principles ("GAAP") or disclaimer.

At the equitable distribution trial, Shriner was tendered as an expert witness in business valuation, forensic accounting, and certified public accounting. Shriner explained his methodology behind the income-based approach he used to calculate Madison's value, as well as his assigned 2.45 revenue multiplier. Shriner based his valuation on four factors: cash assets verified by Quickbooks software, a note receivable, a loan taken by Madison, and goodwill. Shriner had the 2017 tax returns, most of the bank statements, and a summary book, but not a balance sheet.

On cross-examination, Shriner testified he understood the difference between a captive Allstate agency and an independent agency. Shriner defended his 2.45 value multiplier from the "Allstate Agency Price to New/Renewal Commission Ratio (National Average)" chart, because "[i]t was a document that stated what the market rates were in terms of the revenue multiple."

Shriner further acknowledged the chart's valuation was based, in part, on an agency that sold as a part of a group merger, and the chart included only captive Allstate agency sales transactions. Shriner acknowledged Allstate captive agencies have a buy-back provision that an independent agency does not have, which would factor positively into the valuation.

Defendant's counsel provided Shriner with another article, also written by Paul Clarke and PPC Loan, entitled "Allstate Agencies - Why so Valuable?" The article states Allstate captive agencies are very unique, as compared to their peers in

other service sector industries, because Allstate-only agencies have resources available to them that independent agencies do not have. The article provides a chart illustrating Allstate captive agencies having a superior multiple, in value, as compared to independent agencies. Clarke and PPC Loan valued Allstate captive agencies at 2.5 times the annual commissions and valued independent agencies at 1.5 times the annual commissions.

Defendant tendered Tom Franks, as an expert witness in certified public accounting, business valuation, and forensic accounting. Franks testified he had significant experience in the insurance business and had owned an independent insurance agency for ten years, from 1978 through 1988. The trial court admitted Franks as an expert witness only in certified public accounting. The court found he had "minimal business valuation experience, had maintained minimal continuing education in business valuation methodologies, and had not prepared more than two business valuations for insurance agencies."

The trial court entered an equitable distribution order valuing Madison by using Shriner's 28 November 2018 letter's valuation amount of $511,212, less a preliminary distribution to Plaintiff of $21,003.45, giving Madison a net value of $490,208.55. Tax consequences of a sale were not factored into the value of Madison.

The equitable distribution order also distributed IRA and 401(k) accounts. The trial court found a 10% penalty would accrue if the accounts were immediately

withdrawn. The trial court also found there would be a taxable event creating tax consequences when the money was withdrawn, and reduced the value of the American Traditional IRA from $138,847.65 to 104,135.74, the Lumina Wealth IRA from $20,601 to $15,450.75, and the Principal 401(k) from $28,362 to $21,271.50 to account for those consequences. Defendant appeals.

## II. Jurisdiction

This Court possesses jurisdiction pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 50-19.1 (2019).

## III. Issues

Defendant argues the trial court erred by: (1) failing to reasonably approximate the value of Madison by basing the valuation on incompetent evidence; (2) refusing to qualify Franks as an expert witness in the field of business valuation; (3) calculating early withdrawal penalties for retirement accounts, but not calculating imbedded taxes for Madison; and, (4) distributing payments on a note payable to Madison to Plaintiff where Madison is not a party to this suit.

## IV. Valuation of Madison

Defendant asserts the trial court's findings did not reasonably approximate the value of Madison and made erroneous conclusions of valuation upon incompetent evidence.

### A. Standard of Review

> [T]he standard of review on appeal from a judgment entered after a non-jury trial is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment. The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary.
>
> The trial court's findings need only be supported by substantial evidence to be binding on appeal. We have defined substantial evidence as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. As to the actual distribution ordered by the trial court, when reviewing an equitable distribution order, the standard of review is limited to a determination of whether there was a clear abuse of discretion. A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason.

*Peltzer v. Peltzer*, 222 N.C. App. 784, 786-87, 732 S.E.2d 357, 359-60 (2012) (citations, quotation marks, and brackets omitted).

"The task of a reviewing court on appeal is to determine whether the approach used by the trial court reasonably approximated the net value of the partnership interest. If it does, the valuation will not be disturbed." *Poore v. Poore*, 75 N.C. App. 414, 419, 331 S.E.2d 266, 270 (1985) (citation omitted).

The holding in *Poore* has been applied to closely-held corporations. *Patton v. Patton*, 318 N.C. 404, 406, 348 S.E.2d 593, 595 (1986) ("the trial court should make specific findings regarding the value of a spouse's professional practice and the existence and value of its goodwill, and should clearly indicate the evidence on which

its valuations are based, preferably noting the valuation method or methods on which it relied."(citation and quotation marks omitted)).

## B. Analysis

The equitable distribution order states, in relevant parts:

> 33. The Court received testimony from the parties and expert witnesses regarding the business entity known as Madison Insurance Group, Inc. Based upon the credible evidence received, the Court makes the following specific findings of fact regarding this asset:
>
>> a. The parties acquired the foregoing business during the course of the marriage and prior to the date of separation; at the time the parties acquired the business, they purchased the business using a multiplier of two times the gross revenue of the business in order to determine the value of the entity. The parties borrowed money from the marital residence in order to fund this purchase; that following the purchase of the business and until the date of separation, the business paid the mortgage associated with the residence, and the parties considered the debt secured by the residence and associated with the purchase of the business to be a business liability.
>>
>> b. Madison Insurance Group, Inc. is an insurance agency with its primary operating location in Madison County, North Carolina. Since the purchase of the business and through the present date, the Husband has operated this business.
>>
>> c. The Husband made an additional purchase of another agency in the Buncombe County, North Carolina, and folded this business into Madison Insurance Group, Inc. This location has been operated under the business name of Madison Insurance Group,

Inc. since it was acquired by the parties and continues to operate at the present time.

d. The business maintains certain assets, including tangible personal property, intangible accounts, accounts receivable, renewable contracts, and liabilities including but not limited to loans and credit card debt.

e. The business is an independent agency and sells policies backed by approximately 30 different vendors. The primary vendor, accounting for approximately one third of the policies written, is Allstate insurance.

f. The Husband testified and the Court finds credible on this particular issue, that the parties purchased Madison Insurance Group, Inc. in order to have an insurance agency operated by the parties which was not a captive Allstate agency. At the time the parties purchased Madison Insurance Group, Inc., the Husband owned a captive Allstate agency. It was the intention of the parties to acquire Madison Insurance Group, Inc. in order to generate greater revenue and to have access to different products and vendors.

g. The Husband testified as to his belief regarding the value of this business. The Husband testified that he believed the business value to be nominal, based upon his belief that the business entity has operated at a loss for years. The Court does not find this testimony to be competent nor does it find the testimony to be credible. Regarding the issue of competency, the Husband was not qualified as an expert in business valuations and did not provide any business valuation methodology appropriate for determining the fair market value of the business. Furthermore, regarding credibility, the Court finds that the Husband executed a personal financial statement on 22 June 2017, approximately three months prior to the separation parties (sic), where he listed the business as having a value of

$400,000 or approximately two times the gross revenue of the business.

. . .

i. The Wife tendered an expert witness, Mr. Foster Shriner, for the purpose of determining a business value for Madison Insurance Group, Inc. Mr. Shriner was tendered as an expert witness in certified public accounting, forensic accounting, and business valuations. The Court accepted Mr. Shriner as an expert witness in all three areas, and found the witness to be competent to testify, and found the testimony of the witness to be credible and of assistance to the Court in determining the fair market value of the business. Pursuant to the testimony of Mr. Shriner, the Court makes the following specific findings regarding Madison Insurance Group, Inc.:

1. That industry standard for valuing an insurance agency considers the use of a multiplier of the gross sales of the business; that depending on the type, size and volume of the agency, a multiplier of 2 to 5 times gross sales would be appropriate;

2. That Madison Insurance Group, Inc. is not a captive agency, however, the majority of all policies written from any individual vendor are Allstate Insurance policies; that Allstate policies account for approximately one-third of the sales for Madison Insurance Group, Inc.

3. That Madison Insurance Group, Inc. at the time of separation maintained certain cash accounts, accounts receivable, had outstanding loans paid to third parties (specifically Andy Stowe, brother of the Husband), and had certain goodwill; that furthermore, the business maintained certain debts, including certain liabilities due to a lending institution known as Oak Funding.

4. That in considering the appropriate multiplier to determine the goodwill value of the business, Mr. Shriner considered the industry standards, and also considered multipliers used by Allstate Insurance in valuing agencies considering the size, volume and sales. Mr. Shriner further interviewed professionals in the industry to determine appropriate multipliers. Based upon all sources and consideration, and consistent with industry standard, Mr. Shriner applied a multiplier of 2.45 times gross sales to determine the goodwill of the business. The Court finds this to be reasonable and credible.

5. Mr. Shriner determined the business to have the following assets and liabilities:

| | |
|---|---|
| Cash assets, net of funds held in trust: | $24,790 |
| Notes receivable from A. Stowe: | $30,140 |
| Goodwill and intangibles 2.45 x gross sales of $217,534: | $532,958 |
| Note payable to Oak Funding: | [$](76,676) |
| Madison Insurance Group, Inc. FMV | $511,212 |

6. That at the time that Mr. Shriner completed his evaluation he had requested but had not received 2018 taxes or business information to update his analysis. This information was provided approximately three days prior to the hearing. Mr. Shriner testified that, upon review of the gross sales, the business value would have increased, but only slightly and not in any significant amount. The Court finds it credible that this value is the value of the business as of the date of separation, and on the date of the hearing.

 . . .

- 11 -

> 8. In considering the credible testimony of Mr. Shriner, the Court finds Madison Insurance Group, Inc. to have a fair market value of $511,212 less the preliminary distribution received by the Wife . . . , in the amount of $21,003.45 with a resulting net value of $490,208.55.

(brackets and alterations omitted).

Defendant argues the trial court erred in its valuation of Madison by basing its valuation on incompetent evidence, by utilizing an improper valuation methodology, which did not approximate the market value of the agency and goodwill, and by double-counting revenue in the calculation.

### 1. Competent Evidence

The trial court accepted Shriner's opinion of valuation of Madison, expressed in his 28 November 2018 letter. During the equitable distribution trial, Shriner testified towards the basis of this valuation. A critical part of the evidence was Paul Clarke's article from his company's website entitled "First Quarter 2018 Allstate Agency Value Index," and the included chart: "Allstate Agency Price to New/Renewal Commission Ratio (National Average)" for the fourth quarter 2016, all of 2017, and the first quarter of 2018.

Absent from the record or transcript is Paul Clarke' background or qualifications to assert an opinion of value. This is a distinction Shriner acknowledged during cross examination and in the record, but is not addressed or rectified by either Shriner or the trial court in the equitable distribution order.

Paul Clarke and PPC Loan only financed Allstate captive agencies, not independent agencies like Madison. Shriner relied upon the chart, providing the value of only captive Allstate agencies, to base his opinion. Included in the sample data was an Allstate agency sold as a part of a group merger. The trial court concluded "that Allstate policies account for approximately one-third of the sales of Madison Insurance Group, Inc." However, this conclusion failed to consider and reconcile resources and advantages that a captive Allstate agency has, such as a buy-back provision for a prospective seller and other resources to justify and warrant the higher revenue multiples over that applied to independent insurance agencies.

Paul Clarke's other article, "Allstate Agencies - Why so Valuable?", recognizes the resources and advantages to justify the high multiple of 2.5 for all Allstate captive agencies. The article also valued independent agencies at a multiple of 1.5 times the commissions. Plaintiff argues Defendant's own valuation of Madison at a 2.0 multiplier of sales supports the 2.45 finding to arrive at the value.

The trial court found Defendant's testimony of valuation of Madison not to be credible, due in part to his not being tendered or accepted as a business valuation expert, yet it references this application and value in its order. A business or property owner is competent to testify to the value of his business or property. *Hill v. Hill*, 244 N.C. App. 219, 229, 781 S.E.2d 29, 37 (2015) ("[L]ay opinions as to the value of the property are admissible if the witness can show that he has knowledge of the property

and some basis for his opinion. Unless it affirmatively appears that the owner does not know the market value of his property, it is generally held that he is competent to testify as to its value."). The weight given to that testimony is for the finder of fact to determine. *Phelps v. Phelps*, 337 N.C. 344, 357, 446 S.E.2d 17, 25 (1994) ("[T]he trial judge, sitting without a jury, has discretion as finder of fact with respect to the weight and credibility that attaches to the evidence."). The evidence and findings do not support the trial court's conclusion on valuation.

*2. Valuation Methodology*

The Internal Revenue Service ("IRS") provides the following factors to value the stock of a closely-held corporation:

> SEC. 4. FACTORS TO CONSIDER.
> .01 It is advisable to emphasize that in the valuation of the stock of closely held corporations or the stock of corporations where market quotations are either lacking or too scarce to be recognized, all available financial data, as well as all relevant factors affecting the fair market value, should be considered. The following factors, although not all-inclusive are fundamental and require careful analysis in each case:
>
> *(a) The nature of the business and the history of the enterprise from its inception.*
>
> *(b) The economic outlook in general and the condition and outlook of the specific industry in particular.*
>
> *(c )The book value of the stock and the financial condition of the business.*
>
> *(d) The earning capacity of the company.*

*(e) The dividend-paying capacity.*

*(f) Whether or not the enterprise has goodwill or other intangible value.*

*(g) Sales of the stock and the size of the block of stock to be valued.*

*(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.*

Rev. Rul. 59-60, 1959-1 C.B. 237 (January 1, 1959) (emphasis supplied).

This Court's precedents provide further guidance on valuation. Specifically, a trial court should consider: "(a) its fixed assets including cash, furniture, equipment, and other supplies; (b) its other assets including accounts receivable and the value of work in progress; (c) its goodwill, if any; and (d) its liabilities." *Poore*, 75 N.C. App. at 419, 331 S.E.2d at 270 (citations omitted); *Goodwill*, Black's Law Dictionary (11th ed. 2019) ("A business's reputation, patronage, and other intangible assets that are considered when appraising the business, . . . the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets.").

However, this Court in *Poore* cautioned trial courts "to value goodwill with great care, for the individual practitioner will be forced to pay the ex-spouse tangible dollars for an intangible asset at a value concededly arrived at on the basis of some

uncertain elements." *Poore*, 75 N.C. App. at 421, 331 S.E.2d at 271 (citation and quotation marks omitted).

As noted above, when valuing goodwill of a closely-held business, several factors should be examined: "the age, health, and professional reputation of the practitioner, the nature of the practice, the length of time the practice has been in existence, its past profits, its comparative professional success, and the value of its other assets." *Id.* (citations omitted).

Here, the trial court found accounts of cash assets verified by Quickbooks software and a note receivable. The trial court further found the intangible goodwill asset and computed a liability balance of the loan taken by Madison. The trial court's designation was based upon Shriner's findings, where he had the 2017 tax returns, most of the bank statements, and a summary book but not a balance sheet.

The evidence before and findings and conclusions by the trial court did not utilize the factors from *Poore* or the IRS for valuing a business. The trial court's order made no mention of the nature of the business and the history of the enterprise from its inception, the economic outlook in general and the condition and outlook of the specific industry in particular, the financial condition of the business, the company's earning capacity, the market price of corporations engaged in the same or a similar line of business, or factors that led to the finding of intangible goodwill.

The trial court did not address the framework in *Poore* in finding and valuing goodwill. It simply addressed the amount of goodwill by concluding Madison "had certain goodwill." Outside of this conclusory statement, the trial court began consideration of the appropriate multiplier to apply to the goodwill, even though the multiplier was derived from a non-analogous source applying un-adjusted factors.

The trial court failed to address "the age, health, and professional reputation of the practitioner, the nature of the practice, the length of time the practice has been in existence, its past profits, its comparative professional success, and the value of its other assets." *Poore*, 75 N.C. App. at 421, 331 S.E.2d at 271.

The trial court merely evaluated one years' past performance in the form of a balance sheet and a tax return. While there may ultimately be goodwill or other intangible assets to include, the trial court did not conduct any further analysis to support the conclusion of value of goodwill. *Id.* at 422, 331 S.E.2d at 272.

*3. Apportionment of Revenue*

During direct examination, Defendant testified:

> [Defense Counsel]: So in 2016 the corporation earned commissions of $217,534?
>
> [Defendant]: Yes.
>
> [Defense Counsel]: What was the – where did the cash assets bank accounts come from?
>
> [Defendant]: They came from that revenue.

[Defense Counsel]: So you have [$]217,000 and then [$]24,790 that's actually the same funds?

[Defendant]: Correct.

. . .

[Defense Counsel]: And the monies that were paid to Andy Stowe of the loans the corporation made to Andy Stowe, what were the source of funds for those amounts?

[Defendant]: That revenue.

[Defense Counsel]: The [$]217,534?

[Defendant]: That's correct.

Shriner counted the cash asset and note receivable twice in the asset section: as both revenue in the annual revenue and as an account. Neither Shriner's testimony, Shriner's letter, nor the trial court's order provides a remodeling or reason for this double count of these amounts.

Defendant argues our Supreme Court's reasoning in *Seifert* is controlling. *Seifert v. Seifert*, 319 N.C. 367, 354 S.E.2d 506 (1987). In *Seifert*, the Supreme Court of North Carolina examined a double reduction of the value in an equitable distribution calculation of a military service member's pension. The Court held: "The effect is an unfair or inequitable reduction in the value of the award between the date of separation and the date of the employee-spouse's retirement." *Id.* at 371, 354 S.E.2d at 509-10. The Court in *Seifert* prohibited a double discount.

What occurred here is a double credit. While not controlling, it is instructive to the facts before us. Allowing the double credit of the same funds created an "unfair" and "inequitable" increase in the value of the company. *Id.*

The trial court erred in calculating the value of Madison by utilizing incompetent evidence, conducting an improper valuation of Madison incorporating methodology that did not approximate the value of the practice and goodwill, and by double counting revenue in the calculation. We reverse these portions of the order and remand to the trial court for additional findings and calculations of the value of Madison to support its conclusions. *See id.*

## V. <u>Refusal to Qualify Franks as an Expert</u>

### A. Preservation

Defendant argues the trial court erred by not accepting Franks as an expert witness in the field of business valuation. Plaintiff asserts the issue is not properly preserved for appellate review by this Court.

N.C. R. App. P. 10(a)(1) requires: "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." During the trial, Franks was qualified as an expert witness in the field of certified public accounting. When

defense counsel sought to ask Franks a question about the methodology of business

valuation Plaintiff objected and asserted a *Daubert* challenge:

> [Plaintiff's Counsel]: Your Honor, he was not qualified as a business valuation expert. He was qualified as a CPA. He's not establishing appropriate methodology. And based on [N.C. Gen. Stat. §] 8C-702, I don't think the expert evidence that he's presenting passes a Daubert challenge.
>
> [Court]: There's been a Daubert challenge made. [Defense Counsel] would you like to respond to that?
>
> [Defense Counsel]: Your Honor, I don't think there's any question that this expert has specialized knowledge. I don't think there's any question that his testimony can assist the Court to understand some of the issues in this case. The weight you give it is totally up to the Court. It's not an admissibility issue, it's a weight issue. The basis of his opinion is based upon facts known to him and reasonably relied upon by experts. You have testimony before this Court from Mr. Shriner that the rule of thumb is the appropriate methodology. That's the methodology he used. You have testimony from Mr. Franks that that is also the methodology that he used. It appears the only difference is the multiple factor used, and I think he is surely competent in his experience to tell what that should be.
>
> . . .
>
> [Plaintiff's Counsel]: The difference between Mr. Shriner and Mr. Franks is that Mr. Shriner was admitted as a business valuation expert. Mr. Franks has not been admitted as a business valuation expert. And under North Carolina Law, as a CPA he cannot render an opinion. This is no more than a personal opinion and it is not something - - under same rule with Mr. Stowe providing that same impression or belief of what the value was. When we go through this - - and again, Your Honor hasn't, I don't believe, reviewed the evaluation. But nothing on this

evaluation that he has presented lays out his multiplier. Nothing in his evaluation does anything other than say I think this. [That] is not an appropriate standard under Daubert. Because he has not been admitted as an expert in business valuation all he can testify to - - I guess he can opine as to the cash flow, the taxes and everything else, but it is not a business valuation that's subject to being admitted by this Court, because again it does not provide assistance to this Court. It does not rely upon principles. I don't believe that he - - again, there's a reason why Your Honor did not admit him as a business valuation expert. He doesn't have the basis, the credentialing and the skill set to provide assistance to Your Honor. So again, under 702 and under the case law of Daubert moving for, most recently, as State versus McCreevy (ph), I don't believe he's competent to testify as to this business value.

. . .

[Defense Counsel]: Your Honor, I think the admissibility test is, is he qualified by knowledge, skill, experience, training and education, and I think that he is. The weight that you give is up to you, but it's not admissibility. It is relevant. It is. We're before this Court on this. And is it reliable, and I think it is reliable. And I think particularly when you look at it in light of he's used the same methodology as Foster Shriner. And he has also had the benefit of having owned an insurance company and been actively involved in the running of the company and knows how it works when Mr. Foster Shriner has not. So I think we do have admissibility. And I think having heard his testimony I would reoffer him as an expert in the area of business evaluations based upon his history and his involvement in the insurance business.

[Court]: Counsel, thank you. The Court will sustain the objection. The Court will not qualify Mr. Franks as an expert in the area of business valuation. You may ask another question, counselor.

Defendant asserts Plaintiff's objection that was sustained by the trial court is error. When an objection is sustained, our precedents and appellate rules do not require the other party to register their own objection on top of having the objection sustained against them. *See* N.C. R. App. P. 10(a)(1). N.C. R. App. P. 10(a)(1) applies when a party failed to object to an action in the trial court and then claims error on appeal. Plaintiff improperly seeks to assert an inverse of N.C. R. App. P. 10(a)(1), where a party does not object and thus has not preserved the issue for appellate review, to bar this Court's review of the issue. Plaintiff's argument is dismissed.

Plaintiff further asserts Defendant did not properly notice Franks' expert testimony prior to trial. N.C. Gen. Stat. § 1A-1, Rule 26(b)(4)(a)(1) (2019). Rule 26(b)(4)(a)(1) mandates the disclosure of any experts prior to trial. This Court recently interpreted this rule in *Myers v. Myers*, holding: "The Rule does require advance disclosure of expert witnesses who will testify at trial, even without a discovery request, discovery plan, or court order." *Myers v. Myers*, __ N.C. App. __, __, 837 S.E.2d 443, 456-57 (2020).

Plaintiff's argument relies on the premise that the only remedy for a discovery violation is exclusion. The goal of N.C. Gen. Stat. §1A-1, Rule 26(b)(4)(a)(1) is "to provide openness and avoid unfair tactical advantage in the presentation of a case at trial[.]" N.C. Gen. Stat. § 1A-1, Rule 26(b)(4)(a)(1). The court in *Myers* leaves the determination of the proper remedy to the discretion of the trial court. *Myers*, __ N.C.

App. at __, 837 S.E.2d at 457. In light of a discovery violation, *Myers* requires a trial court to determine "whether [Defendant's] failure to disclose the expert sufficiently in advance of the trial gave h[im] an 'unfair tactical advantage' at trial or defeated the purpose of 'providing openness' as contemplated by Rule 26(b)." *Myers*, __ N.C. App. at __, 837 S.E.2d at 456. Plaintiff misstates the remedy for this alleged discovery violation. *Id.* ("Here, the trial court's interpretation of Rule 26(b)(4)(a)(1) as *requiring* exclusion of [the expert's] testimony was in error." (emphasis original)). In light of our holding on this issue, additional findings by the trial court on sanctions are not required on remand.

## B. Standards of Review

"A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason . . . that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) (citation omitted).

"Where the plaintiff contends the trial court's decision is based on an incorrect reading and interpretation of the rule governing admissibility of expert testimony, the standard of review on appeal is *de novo*." *Cornett v. Watauga Surgical Grp.*, 194 N.C. App. 490, 493, 669 S.E.2d 805, 807 (2008).

## C. Analysis

This Court reviews this issue for abuse of discretion. *Id.* Defendant does not challenge the trial court's interpretation of N.C. Gen. Stat. § 8C-1, Rule 702 (2019). Defendant proffered Franks as an expert in "business valuation in forensic accounting and certified public accounting." Plaintiff requested a *voir dire* to question Franks' qualifications:

> [Plaintiff's Counsel]: How many CPE courses do you take on a yearly basis in business valuation?
>
> [Franks]: Usually one.
>
> . . .
>
> [Plaintiff's Counsel]: And are you specialized or do you have any specialization under AICPA - -
>
> [Franks]: I do not
>
> [Plaintiff's Counsel]: - - - business valuation?
>
> [Franks]: No,
>
> [Plaintiff's Counsel]: So you are not a CVA - - strike that, and ABV under the AICPA?
>
> [Franks]: No.
>
> [Plaintiff's Counsel]: Do you have any specialized accreditation under NACVA?
>
> [Franks]: I do not.

Franks is a North Carolina licensed certified public accountant and owner of an accounting firm whose practice consists of business valuations, taxes, accounting, and tax planning. The trial court held:

> The Husband tendered an expert witness, Mr. Tom Franks, for the purposes of placing value on the business entity. The witness was tendered as an expert in business valuation, certified public accounting and forensic accounting; upon examination by counsel for the Wife, the Court found that the witness was a certified public accountant, however, had minimal business valuation experience, maintained minimal continuing education in business valuation methodologies, has not prepared business valuations for insurance agencies more than twice in the preceding 30 years and that these were for the purposes of assisting a client in the purchase of an agency. The Court accepted Mr. Franks as an expert witness in certified public accounting, however, did not find him to be an expert in business valuation or forensic accounting. Accordingly, the Court did not consider the witness's testimony regarding a business value for Madison Insurance Group, Inc.

N.C. Gen. Stat. § 8C-1, Rule 702(a) provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> (1) The testimony is based upon sufficient facts or data.
>
> (2) The testimony is the product of reliable principles and methods.

(3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a).

The Supreme Court of North Carolina has recently interpreted Rule 702(a) and examined leading cases interpreting Rule 702(a) by the Supreme Court of the United States: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136, 139 L. Ed. 2d 508 (1997); and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 143 L. Ed. 2d 238 (1999). Our Supreme Court held:

> the witness must be qualified as an expert by knowledge, skill, experience, training, or education. This portion of the rule focuses on the witness's competence to testify as an expert in the field of his or her proposed testimony. Expertise can come from practical experience as much as from academic training. Whatever the source of the witness's knowledge, the question remains the same: Does the witness have enough expertise to be in a better position than the trier of fact to have an opinion on the subject? The rule does not mandate that the witness always have a particular degree or certification, or practice a particular profession. But this does not mean that the trial court cannot screen the evidence based on the expert's qualifications. In some cases, degrees or certifications may play a role in determining the witness's qualifications, depending on the content of the witness's testimony and the field of the witness's purported expertise. As is true with respect to other aspects of Rule 702(a), the trial court has the discretion to determine whether the witness is sufficiently qualified to testify in that field.

*State v. McGrady*, 368 N.C. 880, 889-90, 787 S.E.2d 1, 9 (2016) (citations and quotation marks omitted).

Contrary to Defendant's arguments before the trial court and this Court, Franks' qualifications are pertinent to admissibility, not just weight or credibility of the testimony. *See id.* ("Rule 702(a) has three main parts, and expert testimony must satisfy each to be admissible.").

Defendant has failed to show the trial court abused or did not act within its discretion when the court concluded not to admit Franks as an expert in the field of business valuations. *Id.* Defendant's argument is overruled.

## VI. Tax Implications

Defendant contends the trial court erred by calculating imbedded taxes for retirement accounts but not for Madison when the same testimony was presented for both assets.

### A. Standard of Review

When reviewing an equitable distribution order, our standard of review "is limited to a determination of whether there was a clear abuse of discretion." *White*, 312 N.C. at 777, 324 S.E.2d at 833. "A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason." *Id.*

### B. Analysis

"[E]quitable distribution is a three-step process requiring the trial court to (1) determine what is marital and divisible property; (2) find the net value of the property; and (3) make an equitable distribution of that property." *Petty v. Petty*, 199 N.C. App. 192, 197, 680 S.E.2d 894, 898 (2009) (citation, quotation marks, and brackets omitted).

N.C. Gen. Stat. § 50-20(c)(11) provides that the trial court shall consider the following distributive factor when equitably dividing the marital and divisible property:

> The tax consequences to each party, including those federal and State tax consequences that would have been incurred if the marital and divisible property had been sold or liquidated on the date of valuation. The trial court may, however, in its discretion, consider whether or when such tax consequences are reasonably likely to occur in determining the equitable value deemed appropriate for this factor.

N.C. Gen. Stat. § 50-20(c)(11) (2019).

The trial court made the following finding of fact:

> That with regards to the American Traditional IRA, the Lumina Wealth IRA and the Principal 401(k) as set forth in the preceding paragraph, the parties presented evidence regarding embedded tax consequences and the value of these accounts . . . . That these are pretax retirement plans from which no taxes have been withheld. These accounts are fully subject to taxation at such time as the funds are withdrawn; at the present time, should these funds be withdrawn, there would also be a 10% penalty. *The Court finds that there is no evidence that these accounts will be immediately liquidated, however, the Court further finds,*

> *based upon the credible testimony of Mr. Shriner, that these accounts will have taxable consequences at such time as they are liquidated.* Mr. Shriner further testified, and the Court finds credible, that a 25% reduction in value is appropriate for purposes of valuing these assets when dividing these assets in exchange for post-tax or net of tax assets. (emphasis supplied)

The equitable distribution order distributed the IRA and 401(k) accounts. The trial court found if the funds are withdrawn at the present time, a ten percent penalty would be assessed. Additionally, the trial court also found "there is no evidence that these accounts will be immediately liquidated." The trial court further found when the funds are withdrawn, it will be a taxable event. The trial court thus reduced the value of each account by twenty-five percent to account for the tax consequences, reducing the American Traditional IRA from $138,847.65 to $104,135.74, the Lumina Wealth IRA from $20,601 to $15,450.75, and the Principal 401(k) from $28,362 to $21,271.50.

The trial court based its tax treatment on the potential future liquidation of the accounts. "Valuation of marital property may include tax consequences from the sale of an asset *only when the sale is imminent and inevitable*, rather than hypothetical or speculative." *Peltzer*, 222 N.C. App. at 797, 732 S.E.2d at 366 (citations omitted) (emphasis supplied). "It is error for a trial court to consider hypothetical tax consequences as a distributive factor." *Plummer v. Plummer*, 198 N.C. App. 538, 548 680 S.E.2d 746, 753 (2009) (internal quotation marks omitted).

The trial court erred by reducing the accounts as a result of a hypothetical tax consequence when the sale or liquidation of the retirement accounts was not "imminent and inevitable," or that the equitable distribution would be a taxable event. *Peltzer*, 222 N.C. App. at 797, 732 S.E.2d at 366. We reverse these portions of the order and remand for additional findings and calculations of the tax consequences and valuations of the retirement accounts.

## VII. Improper Joinder

Defendant argues the note payable was owed to Madison and it was error for the trial court to distribute payments on a note payable of the company to Plaintiff without joining Madison in the action.

The parties and their respective counsels entered a memorandum of judgment on 13 August 2018 addressing the loan underlying the note payable. By agreement the note payable was classified as a loan owed to the marriage in the amount of $97,206.90. Defendant had accepted the first fifty percent of the loan repayment individually and used the funds for his and Madison's benefit. The parties agreed the remaining balance was owed to Plaintiff as an interim distribution. Defendant is bound to the memorandum of judgment. *See Smith v. Smith*, 247 N.C. App. 135, 786 S.E.2d 12 (2016). Defendant's argument is dismissed.

## VIII. Conclusion

We affirm the trial court's treatment of the payments from the note payable and the trial court's denial of admitting Franks as an expert witness in business valuation. We reverse the trial court's finding and conclusion valuing Madison and assessing a hypothetical tax consequence without a finding and conclusion the sale or liquidation of the retirement accounts was "imminent and inevitable" to trigger the penalty. *Peltzer*, 222 N.C. App. at 797, 732 S.E.2d at 366.

These portions of the trial court's order are reversed and remanded for further proceedings not inconsistent herewith. *It is so ordered.*

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Judges BERGER and COLLINS concur.